# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

In re:

Reed Larson,

        Debtor.

                           Chapter 7
_____      BKY 14-44870-KHS

John R. Stoebner, Trustee,

        Plaintiff,

      v.                          ADV 15-4049-KHS

Reed Larson and Christopher Zurn,

        Defendants.

---

In re:

Reed Larson,

        Debtor.

                           Chapter 7
_____      BKY 14-44870-KHS

Daniel M. McDermott, United States Trustee,

        Plaintiff,

      v.                          ADV 15-4050-KHS

Reed Larson,

        Defendant.

---

# MEMORANDUM OPINION AND ORDER

1

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 03/02/2016
Lori Vosejpka, Clerk, by LH

At Minneapolis, Minnesota, March 2, 2016.

These adversary proceedings were before the court for a four day trial commencing on September 21, 2015, and concluding on October 5, 2015.  The United States Trustee seeks an order denying the defendant's discharge pursuant to 11 U.S.C. § 727(a)(2)(A), (a)(2)(B), (a)(4)(A) and (a)(5) in adversary no. 15-4050.

The Chapter 7 Trustee sought an order denying the defendant's discharge pursuant to 11 U.S.C. § 727(a)(2), (a)(3), (a)(4)(A), and (a)(5) in adversary no. 15-4049.  In addition, the Ch. 7 Trustee sought an order determining that a Sea Ray 185 and Sea Ray Amberjack (the "Boats") are the sole property of the defendant along with an order requiring the turnover of the boats to the bankruptcy estate.  The Ch. 7 Trustee's complaint with respect to the Boats is against Christopher Zurn, a friend of the defendant listed as the co-owner of the Boats on the defendant's schedules.  The Ch. 7 Trustee also filed an objection to the defendant's homestead exemption.

The U.S. Trustee and Ch. 7 Trustee's complaints and the Ch. 7 Trustee's objection to the homestead exemption were jointly heard at trial.  After the trial, the Ch. 7 Trustee and the defendant settled the homestead objection, as well as causes of action against third parties, including Zurn.[1]

Colin Kreuziger appeared on behalf of the U.S. Trustee; Ralph V. Mitchell and Andrew J. Stoebner appeared on behalf of the Ch. 7 Trustee; and Erik A. Ahlgren appeared on behalf of the defendant.  Zurn testified but no one appeared for or argued on his behalf at trial.  This court has jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 157(b)(1) & 1334, FED. R. BANKR. P. 7001, and Local Rule 1070-1.  This is a core proceeding within the meaning of 28

---

[1] There is a dispute as to whether the Ch. 7 Trustee settled the denial of discharge cause of action, this is discussed below.

U.S.C. § 157(b)(2)(J).  Venue is proper before this court under 28 U.S.C. §§ 1408 & 1409.

For the reasons stated below the court finds in favor of the U.S. Trustee and against the

defendant.  The defendant's discharge is denied.

## THE PARTIES

Plaintiff Daniel M. McDermott is the United States Trustee for Region 12.   The U.S.

Trustee has standing to commence his adversary proceeding pursuant to 28 U.S.C. § 586(a) and

11 U.S.C. § 727(c)(1).

Plaintiff John R. Stoebner is the chapter 7 trustee of the defendant's bankruptcy estate.

The Ch. 7 Trustee had standing to commence his adversary proceeding pursuant to 11 U.S.C. §

727(c)(1).

Defendant Reed Larson is a resident of the State of Minnesota and the debtor in this

bankruptcy case.

Defendant Christopher Zurn is a resident of the State of Minnesota.

## WITNESSES

The following witnesses provided testimony at the trial:

- John Stoebner – Mr. Stoebner is the chapter 7 trustee of the defendant's
  bankruptcy estate.  Mr. Stoebner was a credible witness.

- Jillene Stuart – Ms. Stuart is the defendant's ex-girlfriend and she testified
  regarding the defendant's assets and liabilities.  Although Ms. Stuart and the
  defendant had a tumultuous on again/off again relationship, that included a
  brief 6 month engagement, the court finds that Ms. Stuart was a very credible
  witness. She had moved on from her relationship with the defendant and gave
  no appearance of bias.

- James Reiter – Mr. Reiter testified on behalf of the Ch. 7 Trustee regarding
  the value of the defendant's alleged homestead.  Mr. Reiter was a credible
  witness.

- Patty Yorks – Ms. Yorks testified on behalf of the defendant regarding the

value of the defendant's alleged homestead.  Ms. Yorks was a credible witness although there were significant problems with her valuation methodology.

- Carole Johnson – Ms. Johnson is the defendant's mother and she provided testimony regarding the defendant's rental income, assets, liabilities and transfers or disposition of his assets.  Ms. Johnson was a credible witness but she appeared to be biased in favor of the defendant and against Ms. Stuart.

- George Jacob – Mr. Jacob is a friend of the defendant and he provided testimony regarding the defendant's California lease and the rental of the defendant's Minnesota property.  Mr. Jacob was a credible witness.

- Tonya Constantine – Ms. Constantine is a friend of the defendant and thinks of him like a brother.  Ms. Constantine is the wife of Christopher Zurn, who also testified at trial.  Ms. Constantine testified about the alleged ownership of the Boats and a Toyota 4Runner.  Ms. Constantine was not a credible witness.  Ms. Constantine and Mr. Zurn are separated and were in the process of getting a divorce at the time of the trial.  When questioned by counsel for the Ch. 7 Trustee, Ms. Constantine made it clear that she would benefit financially if Mr. Zurn is found to own any assets that the defendant alleges belong to Mr. Zurn.  Specifically, Ms. Constantine testified:

> Q.  You don't really know what vehicles [Mr. Zurn] owns do you?
>
> A.  No, that's not true.  I do know the vehicles he owns because now with us going forward with a divorce anything that he owns I am very interested in.
>
> Q.  So you have an interest in his owing a 95 percent stake in this boat?
>
> A.  Absolutely I do.
>
> Q.  A financial interest?
>
> A.  Right, as well as the 4Runner.
>
> ***
>
> A.  … When I stated this is a guy [Zurn] who probably has a hangar of machines, I did not mean cars or boats.  I know exactly how many cars and boats that Chris [Zurn] owns, because like I said, when you file for divorce you become very interested in anything that has equity in it.

- Christopher Zurn – Mr. Zurn is the defendant's best friend and is identified by the defendant as the co-owner of the Boats listed by the defendant on his

4

bankruptcy schedules.  Mr. Zurn provided testimony regarding the alleged ownership of the defendant's assets.  Mr. Zurn was a somewhat credible witness but testified that he would do anything for the defendant.  This casts doubt on his testimony about joint ownership of assets.

- Reed Larson – Mr. Larson is the defendant and was not a credible witness. He was evasive in his testimony and got angry when challenged or confronted with information.

## PROCEDURAL HISTORY

On December 9, 2014, the defendant filed a petition for relief under Chapter 7 of the Bankruptcy Code.  The case is currently pending before this court, and it remains open.

On March 6, 2015, the Ch. 7 Trustee timely filed his complaint against the defendant and Zurn.  That proceeding was settled pursuant to a settle agreement and an Order approving the settlement dated December 15, 2015.  There is a dispute as to whether the Ch. 7 Trustee settled the objection to discharge cause of action, but the defendant acknowledges that this is moot if the court rules in favor of the U.S. Trustee.  Because the court finds in favor of the U.S. Trustee, the issue is moot.

On March 9, 2015, the U.S. Trustee timely filed his complaint against the defendant.

## FACTS

The following facts were either stipulated to by the parties or found by the court after trial.

### I.      Real Property

#### A.      The Casco Point House

1.      The defendant is a resident of the State of Minnesota and owns real estate located at 2773 Casco Point Road, Wayzata, MN ("Casco Point").  Casco Point is located on Lake Minnetonka, a lake with highly desirable residential lots and homes located a short distance from

downtown Minneapolis, Minnesota.  The defendant purchased Casco Point in 2001 for $750,000.

2.      On June 12, 2012, the defendant provided a personal financial statement to Eagle Valley Bank and valued Casco Point at $990,000.

3.      On July 1, 2013, the defendant provided another personal financial statement to Eagle Valley Bank and valued Casco Point at $870,000.

4.      The Hennepin County 2014 tax statement estimated the value for Casco Point at $861,000 as of January 2, 2013.  The Hennepin County 2015 tax statement estimated the value for Casco Point at $905,000 as of January 2, 2014.

5.      On the petition date, the mortgage debt secured by Casco Point was approximately $750,182.17.

6.      The defendant valued Casco Point as $860,000 on his schedules.

7.      After buying the property and prior to the petition date, the defendant extensively renovated Casco Point.  He remodeled the first floor, removing a load-bearing wall, replacing the existing fireplace, replacing flooring and windows, installing custom kitchen cabinetry, replacing kitchen countertops, replacing kitchen appliances, replacing the furnace and central air conditioning unit, replacing exterior trim boards, building exterior flower boxes, and painting interior walls.  He engaged an interior decorator to update the furnishings and choose paint colors.

8.      The defendant, in his exhibits, identified home improvement expenses totaling $40,291 during 2013 and 2014.  This amount does not cover the entire amount spent on remodeling by the defendant since buying Casco Point.

9.      While there was extensive testimony from two witnesses, Patty Yorks, a real estate agent and James Reiter, a real estate broker, regarding the value of Casco Point as of the

6

petition date, the court will not address the experts' opinions of value because they were not

available to the defendant at the time he stated a valuation on his schedules. While the U.S.

Trustee asserts that the defendant significantly undervalued Casco Point, the court finds instead

that the defendant's valuation was reasonable given the tax statements and lack of evidence that

the cost of the improvements concomitantly raised the value of Casco Point.

10.     The issue of the validity of the homestead exemption was settled by the Ch. 7

Trustee.

B.     The Gun Lake Cabin

11.     In 2006, the defendant purchased a cabin on Gun Lake.  He tore down the existing

cabin and built a new cabin.   In May of 2014, the defendant sold the cabin on a short sale basis.

The defendant received no compensation from the sale of the Gun Lake cabin. He did not

disclose the sale of the Gun Lake cabin on his original statement of financial affairs.

**II.     Travel To and From California**

12.     The defendant began spending time in California both in an attempt to build a

sales territory in the area and to spend more time with Stuart.  In December of 2013, the

defendant packed his personal property, including clothes, tools, and his computer, placed them

inside of his BMW and arranged for the BMW to be transported to California.  Other items were

shipped via UPS to California.   Furniture and some personal items were left in the basement at

Casco Point.

13.     The defendant split his time between Minnesota and California in the first half of

2014.  After breaking up with Stuart, in August 2014, the defendant returned to Casco Point.  He

went back to California in November 2014, and rented a beach house on a short term basis with

friends.  On the date of filing the petition, the defendant was staying in a rental on Capistrano

7

Beach in California.

14.     In Schedule G the defendant failed to list the lease he entered into for the

Capistrano Beach house. This lease began in early November 2014 and was extended through

approximately March 27, 2015.

### III.     Personal Property

#### A.     Gun Lake Cabin Furnishings

15.     At the time the defendant sold, or was preparing to sell, the Gun Lake cabin,

Johnson held two rummage sales in the summer of 2014 and sold some of the defendant's

personal property for approximately $400-$500.  Johnson kept the money from the rummage

sales.  The defendant also separately sold the furniture in the cabin to the purchaser of the cabin

for $1,500.00.   The remaining items were either taken by family members or brought to the

dump.  The defendant did not list these sales or transfers on his original statement of financial

affairs.

#### B.     Golf Course Membership

16.     On the petition date the defendant owned a membership interest in the Island

View Golf Club in Waconia, Minnesota.  He testified that he was reminded, after the filing of his

case, that he could get reimbursement of the $4,000 dues if he resigned his membership and a

new member took his place.  The defendant did not list the club membership or the right to

reimbursement of his dues on his original schedules. The defendant stated that he "forgot" that

he owned the membership, which the court does not find credible.

### IV.     Automobiles, Boats and Recreational Vehicles

#### A.     The BMWs

17.     The defendant owned two BMW cars during the year prior to the bankruptcy

8

filing. On August 23, 2013, the defendant traded in his 2008 BMW 528 and purchased a 2011

BMW 525XIA.  On August 26, 2013, the defendant sold his 1995 BMW 325i convertible to

Daniel J. Lieberthal.  The contract to sell the 1995 BMW 325i is handwritten and does not

include a sale price.  The defendant has no relationship with Lieberthal other than this one

transaction.  The defendant did not list the trade and sale of the BMWs on his original statement

of financial affairs.

B.     The Toyota 4Runner

18.     In April 2014, the defendant purchased a Toyota 4Runner in California with cash.

Both the defendant and Zurn testified that Zurn gave the defendant the cash to purchase the car

on Zurn's behalf.  No California title or sale documentation was produced.

19.     The defendant admits that he arranged and paid to have the car shipped back to

Minnesota.

20.     The State of Minnesota issued a title for the Toyota 4Runner in the name of

Christopher Zurn on June 26, 2014.   The car is insured in Zurn's name but was sometimes kept

at Casco Point. The defendant uses the car.  The court finds that the testimony provided by the

defendant, Zurn and Constantine was credible on the issue of ownership of the Toyota 4Runner.

There is no documentation to show that the defendant owned the car.  Rather, the title was issued

by the State of Minnesota to Zurn and there was no evidence showing that a title was ever issued

in the defendant's name.  Use alone does not prove that the defendant owned the car. Thus, the

court finds that the Toyota 4Runner belonged to Zurn on the petition date.

C.     The Pontoon Boat and Paddle Boat

21.     Prior to going on the record at the January 6, 2015, creditors' meeting, the

defendant informed the Ch. 7 Trustee that he had given a small, 12 to 13 foot pontoon boat to his

9

brother, Wayde Larson, at about the same time he sold the Gun Lake cabin.  The defendant did

not disclose the transfer of this boat on his original statement of financial affairs.

22.      At the time that the defendant sold the Gun Lake Cabin, he also transferred a

paddle boat to an unidentified family member.  This transfer was not disclosed on the original

statement of financial affairs.

D.      The Boat Trailers, Docks and Lifts

23.      The defendant did not list any boat trailers, other watercraft equipment, docks, or

a boat lift on his original schedules.  Both the boat lift and part of the dock were purchased by

the defendant with Casco Point in 2001. The boat lift and dock are removed from the water each

year.

24.       Both boats, described below, have trailers and they were moored at the dock

located at Casco Point.  Zurn built the trailer for the Amberjack.  It is used for taking the boat in

and out of the water and storing the boat.  It does not have a certificate of title.  When asked at

the March 17, 2015, continued creditors' meeting why the trailers were not listed, the defendant

explained "I just figured the boat and trailer were synonymous together." He also testified that he

thought that the dock went along with the real estate. The court finds this explanation to be

reasonable.

E.      The Runabout and the Amberjack

25.      On Schedule B the defendant listed a 5% ownership interest in two boats:  a 1991

Sea Ray 185 (the "Runabout") and a 1992 Sea Ray Amberjack (the "Amberjack").  The

defendant and Zurn claim that Zurn owns the other 95% of each boat pursuant to contracts

between them.

26.      The defendant purchased the Runabout as a used boat on or about July 31, 2000,

10

and the boat has always been titled solely in the defendant's name.  Included with the Runabout

at the time of purchase was a trailer that has also always been titled solely in the defendant's

name.  The insurance on the Runabout and trailer have always been in the defendant's name.

When the defendant owned a cabin on Esquagamah Lake, before purchasing the Gun Lake cabin,

the Runabout was kept at that lake. After selling the Gun Lake cabin the boat was kept at Casco

Point.

27.    There is no debt secured by the Runabout.

28.    Zurn has taken the Runabout on annual family vacations and he has occasionally

used it on Lake Minnetonka.

29.    Despite the defendant's claim of joint ownership, both the defendant and Zurn

testified that they kept the defendant titled as the sole owner because of restrictions by the Lake

Minnetonka Conservation District Code of Ordinances.  Section 2, Subd. 3 of the ordinances

states "All of the restricted watercraft moored or docked at a dock or mooring at the site must be

owned by and registered to persons who live in the one residential structure …."  The fact that

the defendant would claim to be the sole owner in order to circumvent restrictions against non-

residents mooring their boats on Lake Minnetonka shows he is willing to flout the law to suit his

own needs and desires.

30.    In May of 2009, the defendant and Zurn purchased the Amberjack for $35,000. It

is jointly titled in both of their names.  The Amberjack was purchased in Norwalk, Connecticut

and shipped to Minnesota.  Both the defendant and Zurn contributed to the down payment on the

Amberjack.  For his part, Zurn borrowed $3,500 from his home equity line of credit (joint with

his wife Constantine).  He wrote the check to Rex Marine Center in Norwalk, Connecticut, on

May 25, 2009.  Zurn obtained a $28,000.00 loan from Wings Financial Credit Union to finance

the remainder of the purchase price.  The defendant personally guarantied the loan.

31.     While the original loan agreement required monthly payments of $293.21, after a May 29, 2014, modification, monthly payments are $289.49. The defendant pays $130 per month through a direct deposit into Zurn's bank account. (This is approximately 45% of the monthly loan payment.)  Zurn then pays $289.49 to Wings Financial. The boat is insured in Zurn's name and the boat is titled in Zurn's name alone.   The boat is stored at Casco Point except in the winter.  Zurn is listed as the managing owner on the Amberjack's Coast Guard boat documentation.  The defendant and Zurn testified that the defendant regularly uses the Amberjack.

32.     During the winter months, both of the Boats are stored at Progressive Systems, Inc.  Zurn has been employed by Progressive Systems since 1991.  Progressive Systems does not charge the defendant or Zurn for their use of the space.

33.     The defendant valued his interest in the Amberjack at $2,250 on his original schedules.

34.     Based on the reaffirmation agreement proposed by Wings Financial, the amount of debt secured by the Amberjack as of the petition date was $14,386.

35.     Prior to the January 6, 2015, meeting of creditors, the defendant provided the Ch. 7 Trustee with documents that purported to be "contracts" between the defendant and Zurn regarding the Runabout and the Amberjack.  The Runabout contract was purportedly dated July of 2007.  The Amberjack contract was purportedly dated July of 2008, but the boat was purchased in 2009.  The defendant and Zurn testified that the date on the contract is a mistake and that the contract was entered into in 2009.  The court finds this unbelievable.  There is only one signature page for the two contracts.  The court is convinced that these contracts could not

have been signed when the defendant says they were.  The court does not believe that this was a simple mistake. The court agrees with the U.S. Trustee's assertions that the boat contracts are not valid. Thus, the court does not find the contracts to be evidence of Zurn's actual percentage of ownership in the boats.[2]

36.     The court finds that the defendant owns 100% of the Runabout and failed to disclose it.

37.     The court finds that the defendant owns 45% of the Amberjack and failed to disclose it.

      F.     The ATV

38.     In late 2013 or early 2014, the defendant sold a Polaris 700 ATV to an unidentified person who worked at Progressive Systems.   The defendant sold the ATV for between $2,500.00 and $3,000.00 and was paid cash.  The defendant did not list the sale of the ATV on his statement of financial affairs.

**V.     The Defendant's Income and Work History**

      A.     Defendant's Employment Income

39.     From July 2008 to October 2013, the defendant owned and operated Precision Graphics, Inc. ("PGI"), a printing company with approximately 16 employees and up to $2,000,000 in revenues.

40.     PGI began to struggle financially and was unable to meet its financial obligations. On October 17, 2013, PGI and the defendant jointly entered into a Voluntary Foreclosure Agreement with Eagle Valley Bank, N.A.  All PGI's assets were turned over to the bank.

---

[2] Constantine testified that she had seen the contracts long before the bankruptcy filing when she had been looking through Zurn's papers at a point when they were having marital troubles and she wanted to know what assets he owned.  The court does not find her testimony to be credible as she openly testified that she wanted Zurn to have as many assets as possible, so she could get her share in their divorce proceedings.

41.     In response to question 1 of the statement of financial affairs, the defendant

disclosed wages and business income for 2012 and 2013, for "Wages & Precision Graphics", but

failed to disclose any wages or income for 2014.

42.     In 2013, the defendant began work as a sales representative with General

Marketing Solutions, LLC.  He was employed by General Marketing Solutions, LLC, at the time

of the trial.

43.     In 2013 and 2014, the defendant also worked as an independent contractor for

Pagel USA ("Pagel").  In 2014, Pagel issued the defendant a Form 1099 indicating that he earned

gross income of $58,980.02 in 2013.  The defendant did not report the income on his 2013

federal or state income tax returns.  In 2015, Pagel issued the defendant a Form 1099 indicating

that he earned gross income of $3,900.00 in 2014.  The defendant's work through Pagel ended in

2014.  The defendant did not disclose any Pagel wages or income on his original statement of

financial affairs.

B.     Casco Point Rentals

44.     In 2013, the defendant decided to rent out Casco Point because of his move to

California.

45.     On August 10, 2013, the defendant hired Jacob, a friend and realtor, to list Casco

Point as a rental property for twelve months, beginning on November 1, 2013.  Jacob listed the

property on the internet and with the Multiple Listing Service.   No inquiries were received and

the agreement with Jacob was cancelled on February 19, 2014, because Jacob found out that the

defendant had listed the property for rent through the website Vacation Rental by Owner, or

VRBO.

46.     In December, 2013, prior to filing bankruptcy, the defendant created the VRBO

14

listing for Casco Point and rented it on the following dates for the following amounts:

|    | Name | Lease Date | Lease Amount |
|----|------|------------|--------------|
| 1  | DeMuse | 5/30 – 6/1 | $1,400 |
| 2  | Cerami | 6/13 – 6/20 | $4,950 |
| 3  | Wilkins/Lee | 6/21 – 6/26 | $4,000 |
| 4  | Walker | 6/27 – 7/2 | $3,700 |
| 5  | Nemer | 7/14 – 7/18 | $2,400 |
| 6  | Anstiss | 7/18 – 7/27 | $6,300 |
| 7  | Oldenburg | 7/27 – 8-3 | $4,000 |
| 8  | Zuendel | 8/4 – 8/7 | $2,800 |
| 9  | Krassin | 8/8 – 8/15 | $4,900 |
| 10 | Clarren | 8/15 – 8/20 | $4,100 |
| 11 | Neatherlin | 8/29 – 9/6 | $5,950 |
|    | Totals |  | $44,500.00 |

47.    The defendant would ordinarily collect a portion of the rent in advance.  After that

Johnson would normally check the renter into the home and collect the remainder of the rent

along with a damage deposit.  However, on three occasions in the early part of 2014, the

defendant asked that the following rent checks be sent to Stuart:

- A $4,900 check from Robert Anstiss dated January 7, 2014, written to Jill Stuart, and deposited into her Wells Fargo bank account on February 4, 2014;
- A $2,450 check from Jabin Krassin dated January 27, 2014, written to Jill Stuart, and deposited into her Wells Fargo bank account on February 4, 2014; and
- A $1,950 check from Sandra Clarren dated February 5, 2014, written to Jill Stuart, and deposited into her Wells Fargo bank account on February 19, 2014.

15

48.     After depositing the checks into her account, Stuart withdrew an equivalent amount of money and gave it to the defendant.  When Stuart received the checks, she asked the defendant why the checks were written to her.  The defendant indicated that he did not want the funds deposited in his bank account because he might have to file for bankruptcy relief.  Stuart consulted with her tax advisor and then told the defendant that she would no longer be a conduit.

49.     Later in 2014, the defendant asked Johnson to greet tenants and collect rent and security deposits.

50.     Between June 3, 2013, and August 29, 2014, Jonson collected at least $20,501 in rents and security deposits on the defendant's behalf.  Specifically, Johnson collected the following amounts when checking renters into Casco Point:

- A $500 check from Mark S. Cerami Trust, Mark S. Cerami, Trustee, dated June 10, 2014, written to Reed Larson, and endorsed to Carole Johnson, and deposited into her US Bank account on June 16, 2014;

- A $2,000 check from Catherine A. Wilkins dated June 21, 2014, written to Carole Johnson, and deposited into her US Bank account on June 23, 2014;

- A $500 check from Catherine A. Wilkins dated June 21, 2014, written to Carole Johnson, and deposited into her US Bank account on June 23, 2014;

- A $2,400 check from Infotel Integrated Services dated June 25, 2014, written to Carole Johnson, and deposited into her US Bank account on June 25, 2014;

- A $500 check from Infotel Integrated Services dated June 25, 2014, written to Carole Johnson, and deposited into her US Bank account on June 25, 2014;

- A $1,200 check from Marc T. Nemer Trustee, The Marc Nemer Revocable Trust, dated July 14, 2014, written to Carole Johnson, and deposited into her US Bank account on July 15, 2014;

- A $1,400 check from Robert Anstiss dated July 19, 2014, written to Carole Johnson, and deposited into her Wells Fargo bank account on July 21, 2014;

- A $2,000 check from R. Sam Oldenburg, dated July 28, 2014, written to Reed

16

Larson, and endorsed to Carole Johnson, and deposited into her US Bank account on July 29, 2014;

- A $500 check from R. Sam Oldenburg, dated July 28, 2014, written to Reed Larson, and endorsed to Carole Johnson, and deposited into her US Bank account on July 29, 2014;

- A $1,376 check from Dianna E. Zuendel dated August 4, 2014 written to Carole Johnson, and deposited into her Wells Fargo bank account on August 5, 2014;

- A $3,000 check from Jabin G. Krassin dated August 8, 2014, written to Carole Johnson, and deposited into her Wells Fargo bank account on August 8, 2014;

- A $2,150 check from Sterling Keith Clarren dated August 5, 2014, written to Carole Johnson, and deposited into her Wells Fargo bank account on August 15, 2014;

- A $2,975 check from Manthey F. Neatherlin dated August 29, 2014, written to Carole Johnson, and deposited into her Wells Fargo bank account on August 29, 2014;

51.     After depositing the rents into her bank accounts, Johnson would withdraw the funds and gave the cash to the defendant.  Between June 10, 2014, and August 30, 2014, Johnson deposited checks and withdrew at least $17,632 in cash that she gave to the defendant.  She retained some of the rents as compensation for her services, as well as expenses incurred with respect to the Casco Point rentals.

52.     The defendant failed to disclose the funds received from Johnson on his statement of financial affairs and failed to disclose any of the rental income for Casco Point on his statement of financial affairs.

**VI.     The Defendant Prepares to File Bankruptcy**

53.     By the summer of 2013, the defendant's companies, including PGI, were struggling financially and he began preparing for an eventual bankruptcy filing.

54.     On October 4, 2013, and again on December 30, 2013, the defendant wrote

checks for $2,500 to his eventual bankruptcy attorney, Erik Ahlgren.

55.     The defendant also confided in Stuart and indicated that he might have to file
bankruptcy if the financial performance of PGI did not improve.

56.     Although he was physically staying in California at the time he filed his petition,
the defendant listed the Casco Point address as his street and mailing address.  Based on the
testimony provided by Stuart and the defendant, the court finds that the defendant intended to
live in California when he shipped his vehicle there and moved in with Stuart in January of 2014.
The defendant moved back to Casco Point in the fall or winter of 2014 after he and Stuart broke
up.  As of the petition date, Casco Point remained the defendant's home and though he was
staying in California, it was only temporary and his listing of Casco Point as his homestead was
not fraudulent.

57.     However, the defendant's failure to list the Capistrano Beach lease in schedule G
or as his current address indicates that he was attempting to conceal this information from the
Ch. 7 Trustee.

58.     The court will discuss any additional facts, as necessary, in the remainder of its
decision.

## DISCUSSION

The U.S. Trustee alleges that the defendant should be denied a discharge pursuant to
various subsections of 11 U.S.C. § 727.

### I.     Burden of Proof

Under § 727(a) the court shall grant the debtor a discharge, unless:

- The debtor, with intent to hinder, delay, or defraud a creditor or an officer of the
  estate charged with custody of property under this title, has transferred, removed,
  destroyed, mutilated, or concealed, or has permitted to be transferred, removed,

18

destroyed, mutilated, or concealed property of the debtor, within one year before
the date of the filing of the petition.  11 U.S.C. § 727(a)(2)(A);

- The debtor, with intent to hinder, delay, or defraud a creditor or an officer of the
estate charged with custody of property under this title, has transferred, removed,
destroyed, mutilated, or concealed, or has permitted to be transferred, removed,
destroyed, mutilated, or concealed property of the estate, after the date of the
filing of the petition.  11 U.S.C. § 727(a)(2)(B);

- The debtor knowingly and fraudulently, in or in connection with the case made a
false oath.  11 U.S.C. § 727(a)(4)(A); or

- The debtor has failed to explain satisfactorily, before determination of denial of
discharge under this paragraph, any loss of assets or deficiency of assets to meet
the debtor's liabilities.  11 U.S.C. § 727(a)(5).

The provisions of § 727 of the Bankruptcy Code are to be strictly and narrowly construed

in favor of a debtor because the denial of a discharge is an extreme remedy.  *In re Charles*, 474

B.R. 680, 683 (B.A.P. 8th Cir. 2012) (citing *In re Korte*, 262 B.R. 464, 471 (B.A.P. 8th Cir.

2001)).  Section 727 was included in the Bankruptcy Code to prevent a debtor's abuse of the

bankruptcy process.  *Id.*  The party objecting to the discharge must prove each element under §

727 by a preponderance of the evidence.  *Id.* at 683-84 (citing *Allred v. Vilhauer (In re Vilhauer)*,

458 B.R. 511, 514 (B.A.P. 8th Cir. 2011)); Fed. R Bank. P. 4005.

Here, the U.S. Trustee argues that the defendant violated Section 727 on multiple

occasions by knowingly or recklessly failing to disclose assets, concealing property or

transactions and making false oaths on his petition, schedules and statement of financial affairs,

and at the meetings of creditors.  The defendant argued that he made mistakes or forgot items

and that his actions were not deliberate or made with the intent to defraud. As discussed below,

the court agrees with the U.S. Trustee and finds that the defendant knowingly and intentionally

failed to disclose items, made false oaths and failed to adequately explain his actions.

**II.      Section 727(a)(4)(A)**

19

The purpose of § 727(a)(4)(A), is to make certain that those who seek the shelter of the Bankruptcy Code do not play fast and loose with their assets or with the reality of their affairs. The Statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. "The successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *Boroff v. Tully,* 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted) (quoting *Matter of Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974)); *In re Freese,* 460 B.R. 733 (B.A.P. 8th Cir. 2011); and *In re Cecil*, 542 B.R. 447 (B.A.P. 8th Cir. 2015).

To establish that a debtor should be denied a discharge under § 727(a)(4)(A) based on a false oath, the party objecting to the discharge must prove (1) the debtor made a statement under oath; (2) that statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re Charles*, 474 B.R. at 684 (quoting *Lincoln Sav. Bank v. Freese (In re Freese)*, 460 B.R. 733, 738 (B.A.P. 8th Cir. 2011)). The U.S. Trustee has met his burden of proof.

First, the defendant made oral and written statements under oath that were false. On December 9, 2014, the defendant filed his bankruptcy petition, schedules and statement of financial affairs, which were signed under oath and contained numerous errors and omissions. They have been amended twice and not all items have been corrected. The defendant also gave false testimony under oath. The omissions and false statements include:

      A.    <u>Schedules and Statement of Financial Affairs</u>: On the original schedules

and statement of financial affairs, the defendant failed to disclose the following items:

- Income from Pagel USA;
- Rental income from Casco Point for 11 different rentals in an amount exceeding $40,000;
- Transfers of rents or security deposits to either Stuart or Johnson;
- Transfer of the sales proceeds from the personal property at the Gun Lake cabin to Johnson;
- Transfers of BMW cars;
- Short sale of the Gun Lake cabin;
- Sale of the personal property/furnishings in the Gun Lake cabin to the purchaser of the cabin;
- Transfer of the pontoon boat to his brother;
- Transfer of the paddle boat;
- Sale of the ATV;
- Ownership interests in the dock;
- Actual ownership percentages of the Runabout and Amberjack boats or alleged transfer of the defendant's interest in the Boats;
- Membership interest in the Island View Golf Club in Waconia, Minnesota;
- The address where the defendant was living on the petition date; and
- The lease for the house on Capistrano Beach in California.

B.      Testimony at the Meeting of Creditors:  At the meeting of creditors, the defendant made the following false oaths:

- The defendant testified that the information in the documents that he filed in his bankruptcy case were true and correct.
- The defendant testified that the only improvements he made to Casco Point since purchasing it in 2001 were new appliances, flooring in the kitchen, and countertops. The defendant had actually made extensive renovations throughout the house.  He removed a load-bearing wall, replaced the existing fireplace, replaced flooring and windows, installed custom kitchen cabinetry, replaced the furnace and central air conditioning unit, replaced exterior trim boards, built exterior flower boxes, and painted interior walls.  These were in addition to the purchases of new appliances, kitchen flooring and countertops.
- The defendant falsely testified that the improvements to Casco Point cost between $10,000 and $12,000.  He had spent almost $40,000 in extensive renovations.
- The defendant falsely testified that he did not sell, transfer or give away any asset within the two years prior to filing. He had transferred a cabin, boats, vehicles, cash and personal items.

21

- The defendant falsely testified that he did not transfer money or property to any close friends or relatives within the six years prior to filing his bankruptcy case.[3] He transferred cash to his mother and girlfriend and transferred various other assets to family and friends.
- The defendant testified that the agreement with Zurn regarding the Amberjack was executed in July of 2008, when the boat was actually purchased in 2009.
- The defendant falsely testified that Zurn made 95% of the loan payments on the Amberjack, when in fact, the defendant made 45% of the payments.

Second, the defendant's misstatements were made with intent. *Frees, supra at* 738 (citation omitted). Proof of intent can be made by circumstantial evidence and a statement made with reckless indifference to the truth is treated as if it is intentionally false. *Id.* Here the evidence is overwhelming that the defendant failed to disclose a substantial amount of income, assets and transfers in his petition, schedules and statement of financial affairs and did not disclose them until after he was confronted by the Ch. 7 Trustee. The defendant had no reasonable explanation as to why the majority of income, rents, transfers or assets were not disclosed. While he had some explanations as to the docks, boat lifts and boats, there was no explanation as to the majority of the omissions. The argument that he amended the schedules later does not support his argument that his failure to disclose should be excused. "The effectiveness of the bankruptcy system depends on the Debtor's complete candor, and it is not the job of the trustee or creditor to search for information about the Debtor that should be readily disclosed in his bankruptcy Schedules and Statements." *Id.* at 739; *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992) ("The petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.") (interior quotations marks and citations omitted); *In re Cecil*, 542 B.R. 447 (B.A.P. 8th

---

[3] The defendant did disclose at the outset of the meeting of creditors that he had transferred the pontoon boat to his brother prior to filing his bankruptcy case.

Cir. 2015) (the Bankruptcy Code requires a debtor to provide the court, the trustee, and the creditors with a complete picture of her assets and liabilities).

When reviewing the evidence and circumstances of this case as a whole, and when considering the defendant's credibility, the court is convinced that the defendant knew, or had reckless disregard for the truth, and that all of the omitted information should have been disclosed. The sheer number and dollar amount of the rentals, income and transfers refute the assertion that the omissions or false oaths are mere mistakes or inadvertent. The fact that income had not been reported on the defendant's income tax returns also supports a finding of intent to defraud. Thus, the court finds that the U.S. Trustee proved fraudulent intent and that that the defendant knew the statements were false.

Finally, the U.S. Trustee must prove that the statements relate materially to the bankruptcy case. "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property. *Id.* at 739 (quoting *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir.1984) (per curiam) (quoted in *Mertz,* 955 F.2d at 598 and *Palatine Nat'l Bank of Palatine, Ill. v. Olson (In re Olson),* 916 F.2d 481, 484 (8th Cir.1990)). The value of the undisclosed asset does not determine whether the subject matter of the false oath is material and failure to disclose even an asset with minimal value may be material. *See Olson,* 916 F.2d at 484. Omissions that are directly related to the debtor's assets, makes the omissions material for purposes of § 727(a)(4)(A). *Id.* Here, all of the omissions relate to the defendant's assets and transfers, making them material. The value is also significant. Thus the U.S. Trustee has met his burden of proof under § 727(a).

The burden now shifts to the defendant to show that he did not act with intent, except for

23

his failure to include the boat trailers.  The defendant has failed to explain the transfers and

omission of assets. He argues that the omissions were inadvertent. The court disagrees.  As stated

above, there is overwhelming evidence to show that he knew or had a reckless disregard for the

truth.

The court finds that the defendant's discharge is denied pursuant to § 727(a)(4)(A). The

court will not address § 727(a)(2)(A), (a)(2)(B), or (a)(5) as there is overwhelming proof that the

defendant made false oaths in violation of § 727(a)(4)(A).

## CONCLUSION

By showing that the defendant omitted all references to the rental of the Casco Point

property, failed to disclose substantial income, and failed to disclose numerous assets and

transfers of assets, the U.S. Trustee has proven by a preponderance of the evidence that the

defendant, in his bankruptcy case and at the meetings of creditors, made material false oaths

knowingly and fraudulently, which was not rebutted by the defendant. Thus, the court sustains

the U.S. Trustee's objection and denies the defendant's discharge pursuant to 11 U.S.C.

§727(a)(4)(A).

## CONCLUSIONS OF LAW

1.  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(J) and this

    Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) & 1334, FED. R. BANKR. P.

    7001, and Local Rule 1070-1.

2.  Venue is proper before this court under 28 U.S.C. §§ 1408 & 1409.

3.  The defendant's discharge is denied.

## ORDER

IT IS ORDERED:  The defendant's discharge is denied pursuant to 11 U.S.C. §

727(a)(4)(A).

      LET JUDGMENT BE ENTERED ACCORDINGLY.


                    /e/ Kathleen H. Sanberg
                    KATHLEEN H. SANBERG
                    UNITED STATES BANKRUTPCY JUDGE